# Supreme Court of Florida

_____

No. SC11-2311
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**ANA I. GARDINER,**
Respondent.

[June 5, 2014]

PER CURIAM.

We have for review a referee's report recommending that respondent Ana I. Gardiner be found guilty of professional misconduct in violation of the Rules Regulating the Florida Bar (Bar Rules) and suspended from the practice of law for one year. The Florida Bar filed a notice of its intent to seek review of the referee's report, challenging the referee's recommended sanction and urging the Court to disbar Gardiner from the practice of law. We have jurisdiction. See art. V, § 15, Fla. Const. As discussed below, we approve the referee's findings of fact and recommendations as to guilt. However, we disapprove the referee's recommendation as to discipline. Considering Gardiner's dishonest conduct and

the harm that her actions have caused to the administration of justice in a capital first-degree murder case, we conclude that disbarment is the appropriate sanction.

**FACTS**

In December 2011, the Bar filed a complaint against Gardiner, alleging that she engaged in misconduct in violation of several Bar Rules. A referee was appointed to consider the matter. Following a hearing, the referee submitted his report for the Court's review, in which he made the following findings and recommendations.

During the period of time at issue in this case, Gardiner served as a circuit court judge in the Seventeenth Judicial Circuit, in and for Broward County, Florida. In 2007, she was the presiding judge in State v. Loureiro, No. 04-15633CF10A (Fla. 17th Cir. Ct.), a capital first-degree murder case. Former Assistant State Attorney Howard Scheinberg was the lead prosecutor in the case.[1] On March 27, 2007, the jury returned a verdict finding Loureiro guilty of first-degree murder. Thereafter, on April 30 and May 1, 2007, Gardiner presided over the penalty phase of the case, and following those proceedings, the jury

_____

1. This Court has already considered the separate disciplinary case against Howard Scheinberg for his conduct during these events. On June 20, 2013, we suspended Scheinberg from the practice of law for two years. See Fla. Bar v. Scheinberg, 129 So. 3d 315 (Fla. 2013).

recommended the death penalty. On August 24, 2007, Gardiner entered an order sentencing Loureiro to death.

On Friday, March 23, 2007, several days before the jury returned its guilty verdict in <u>Loureiro</u>, Gardiner was eating dinner at a restaurant when she encountered Scheinberg. The referee noted that by all accounts, the meeting at the restaurant was accidental and not planned. However, after dinner, Gardiner, Scheinberg, and others decided to continue the evening at a bar. Scheinberg drove to the bar with one member of the group, who was then a law student. During the drive, this person raised with Scheinberg the possible appearance of impropriety that might arise from the judge and the lead prosecutor in a pending murder trial socializing while the case was ongoing. Scheinberg was upset by the conversation, and he left the bar shortly after arriving. The referee found that Gardiner attempted to learn what had upset Scheinberg and that she spoke with him on the phone several times over the course of that weekend.

The <u>Loureiro</u> trial resumed on Monday, March 26, and Gardiner did not disclose her social interaction with Scheinberg. Subsequently, on March 27, after the jury returned its guilty verdict, Gardiner and Scheinberg had a lengthy phone conversation, during which Scheinberg told Gardiner about his discussion with the law student on the way to the bar. The referee found that Gardiner assured Scheinberg there was nothing for him to be concerned about and that she made a

"conscious decision" not to disclose or make known her social interaction and phone calls with Scheinberg.

Beginning with their conversation on March 27, the referee found that Gardiner and Scheinberg commenced a "significant personal and emotional relationship." Between March 23 and August 24, 2007, the day that Gardiner imposed a sentence of death, she and Scheinberg exchanged 949 cell phone calls and 471 text messages. In particular, on the day before, the day of, and the day following Gardiner's actual imposition of the death sentence, she and Scheinberg communicated by phone and text 44 times. The referee further found that Gardiner deliberately and knowingly chose not to disclose this emotional relationship to the defense, despite her clear duty to do so.

Loureiro's attorneys filed a direct appeal from his conviction and sentence in this Court. Shortly thereafter, various media sources began reporting allegations that Gardiner and Scheinberg met socially at a restaurant and a bar during the murder trial. As a result, in November 2008, the Judicial Qualifications Commission (JQC) convened a panel to investigate the matter and determine whether Gardiner engaged in misconduct. Gardiner appeared before the panel on November 13, 2008. In her testimony, she failed to disclose the honest and true nature of her relationship with Scheinberg. The referee found that Gardiner's testimony would leave any reasonable person with the misimpression that her

relationship with Scheinberg was merely professional. She did not disclose their emotional relationship or the significant number of personal phone and text communications they exchanged during the penalty phase of the Loureiro trial. She also did not disclose that her relationship with Scheinberg continued after the trial and intensified. During the period from March 2008 through August 2008, Gardiner and Scheinberg exchanged more than 3000 phone and text communications. The referee found that Gardiner's testimony during the JQC proceedings was a "deliberate act of dishonesty and deceitfulness." At the conclusion of the JQC's investigation, Gardiner received an admonishment based on the appearance of impropriety that resulted from the judge and the lead prosecutor socializing on one night while the capital first-degree murder trial was ongoing.

In Loureiro's direct appeal, this Court relinquished jurisdiction to the circuit court to consider the issue of the communications between Gardiner and Scheinberg, and to determine whether a new trial was required. The Broward County State Attorney hired a special prosecutor to conduct the investigation. On April 30, 2009, Gardiner appeared for a deposition in that investigation. During her testimony, she acknowledged for the first time her ongoing emotional relationship with Scheinberg. Ultimately, the State Attorney's office agreed to a

new trial in the case. At the second trial, Loureiro was convicted and sentenced to life in prison. In April 2010, Gardiner resigned as circuit judge.

Based on these factual findings, the referee recommended that Gardiner be found guilty of violating three Bar Rules. First, the referee found clear and convincing evidence that Gardiner was dishonest and deceitful in failing to disclose—during both the Loureiro trial and the 2008 JQC proceedings—her social encounters with Scheinberg and their significant personal and emotional relationship, in violation of Bar Rules 3-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice may constitute a cause for discipline) and 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). Additionally, the referee found clear and convincing evidence that Gardiner's conduct was prejudicial to the administration of justice, both in the Loureiro case and in the 2008 JQC proceedings, in violation of Bar Rule 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).

The referee found two aggravating factors in this case: (1) Gardiner engaged in multiple offenses, and (2) she has substantial experience in the practice of law. The referee also considered seven mitigating factors: (1) Gardiner did not have a prior disciplinary record; (2) she displayed significant personal or emotional problems; (3) Gardiner testified freely and openly, and cooperated in the

disciplinary proceedings; (4) Gardiner has demonstrated good character and has a good reputation; (5) at the time of the circumstances involved in the instant case, she suffered from clinical depression; (6) other penalties or sanctions have been imposed against Gardiner; and (7) she has demonstrated remorse in her testimony and courtroom admissions.

As to the sanction, the referee recommended that Gardiner be suspended from the practice of law for one year. The referee also awarded costs to the Bar in the amount of $8,117.18.

As noted, the Bar seeks review of the referee's report and recommendations. The Bar asks this Court to disapprove the referee's recommended sanction and instead disbar Gardiner from the practice of law.

**ANALYSIS**

Initially, because neither the Bar nor Gardiner challenges the referee's findings of fact and recommendations as to guilt, we approve those findings and recommendations without further comment. We address here the referee's recommended sanction, a one-year suspension. In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because ultimately, it is our responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So. 2d 852, 854 (Fla. 1989); see also art. V, § 15, Fla. Const. However, this Court will not second-guess

- 7 -

the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So. 2d 555, 558 (Fla. 1999).

The Bar contends that given the evidence of Gardiner's serious misconduct, her knowingly dishonest actions and testimony, and the harm that her conduct caused to the administration of justice in a death penalty case, the referee's recommendation of a one-year suspension is not supported. We agree.

The relevant facts in this case are essentially undisputed. While serving as the presiding judge in a capital first-degree murder case, Gardiner commenced a significant emotional relationship with the lead prosecutor in the case. During a five-month period, Gardiner and Scheinberg exchanged 949 cell phone calls and 471 text messages, including 44 phone and text communications on the day before, the day of, and the day after Gardiner imposed the death sentence. Gardiner intentionally chose not to disclose this relationship to the defense. She also did not disclose the true nature of the relationship to the JQC during its investigation in November 2008. And when the relationship and communications between Gardiner and Scheinberg did come to light, the Broward County State Attorney was required to incur additional expenses to investigate the matter and determine whether a new trial should be granted. Ultimately, the Loureiro case was retried, further consuming court resources, and Loureiro was sentenced to life in prison.

In his report, the referee found that Gardiner's conduct was deliberate and knowing. As a judge, Gardiner knew or should have known of her obligation to avoid even the appearance of impropriety. Although Gardiner asserts that she did not recognize at the time that her social interaction with Scheinberg and their subsequent emotional relationship should have been disclosed, the referee found her explanation was not credible. Moreover, the factual findings indicate that she was placed on notice that her conduct could lead to an appearance of impropriety when Scheinberg told her about his conversation with a then law student on the way to the bar. Gardiner made a choice not to disclose the social interaction at that time and to continue her emotional relationship with Scheinberg. She did not disclose the relationship during the remainder of the Loureiro trial, and she did not describe the true nature of the relationship during the proceedings before the JQC. We agree with the referee that regardless of her motive or reasons for doing so, it is clear that Gardiner's conduct was dishonest and misleading.

It is also clear that Gardiner's actions created an appearance of impropriety in the Loureiro case. Cf. In re Adams, 932 So. 2d 1025, 1027 (Fla. 2006) (stating in a judicial disciplinary proceeding that "[e]ven in the absence of evidence that a romantic relationship with an attorney practicing in a judge's court has influenced the judge's judgment, the judge's authority necessarily suffers" and "the judge necessarily depletes the single most important source of his or her authority—the

perception of the legal community and public that the judge is absolutely impartial in deciding cases."). Significantly, we note that Loureiro was a capital first-degree murder case, in which Gardiner could and did impose the ultimate sentence of death. The referee found that Gardiner's failure to disclose her emotional relationship with Scheinberg tainted the entire legal process. In all cases, due process requires that the proceedings must both be and appear to be fundamentally fair. See Steinhorst v. State, 636 So. 2d 498, 501 (Fla. 1994). Personal conduct of a judge suggesting a bias in favor of the prosecutor is an extraordinarily serious matter in a death penalty proceeding. Here, Gardiner's actions led this Court to relinquish jurisdiction of the Loureiro case to the circuit court for a determination of whether a new trial was required. The Broward County State Attorney hired a special prosecutor to conduct an investigation of Gardiner's actions during Loureiro's trial. And, ultimately, a new trial was required. The special prosecutor concluded that Gardiner's misconduct tainted the proceeding to such an extent that Gardiner's decision to impose the death sentence could not stand.

Given these facts, we believe that Gardiner's misconduct warrants a severe sanction. In considering the separate disciplinary case against Scheinberg, we noted that there is little case law from this Court addressing the situation presented here, where a judge and attorney engage in an emotional relationship, including extensive personal communications, in a capital case, and do not disclose those

communications to the opposing party. Fla. Bar v. Scheinberg, 129 So. 3d 315, 318 (Fla. 2013). In Scheinberg, we considered Florida Bar v. Mason, 334 So. 2d 1 (Fla. 1976), in which the Court suspended an attorney for one year for egregious ex parte communications with justices of the Florida Supreme Court concerning a pending case. In Mason, the Court noted that the ex parte communications at issue were "fundamentally wrong" and that "there can be no temporizing with an offense the commission of which serves to destruct the judicial process." Id. at 6. Although there is no dispute that the communications between Gardiner and Scheinberg did not pertain to the Loureiro case, we find guidance in Mason because Gardiner's actions similarly harmed the judicial process. Because Gardiner was the presiding judge at the time of her conduct, she had a greater responsibility to preserve the integrity of the judicial process and to ensure that the Loureiro trial was fair. Considering Gardiner's dishonest conduct during the trial and in her subsequent testimony before the JQC and the impact of her actions on the administration of justice in a death penalty case, we conclude that disbarment is the appropriate sanction.

Finally, in determining the sanction, we have considered the referee's findings in aggravation and mitigation. As aggravation, the referee found that Gardiner engaged in multiple offenses and has substantial experience in the practice of law. As mitigation, the referee found that Gardiner did not have a prior

disciplinary record; she displayed significant personal or emotional problems; Gardiner testified freely and openly, and cooperated in the disciplinary proceedings; she has demonstrated good character and has a good reputation; at the time of the circumstances involved in the instant case, she suffered from clinical depression; other penalties or sanctions have been imposed against Gardiner; and she has demonstrated remorse in her testimony and courtroom admissions. Indeed, the referee found that other than the circumstances involved in this case, the testimony as to Gardiner's good character and reputation was overwhelming. Nonetheless, we conclude that these mitigating factors do not outweigh Gardiner's serious ethical misconduct.

## CONCLUSION

Accordingly, Gardiner is hereby disbarred. The disbarment will be effective thirty days from the date of this opinion so that Gardiner can close out her practice and protect the interests of existing clients. If Gardiner notifies this Court in writing that she is no longer practicing law and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Gardiner shall fully comply with Rule Regulating the Florida Bar 3-5.1(h). Further, Gardiner shall accept no new business from the date this opinion is filed.

Judgment is entered for The Florida Bar, 651 East Jefferson Street,

Tallahassee, Florida 32399-2300, for recovery of costs from Ana I. Gardiner in the

amount of $8,117.18, for which sum let execution issue.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA,
and PERRY, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE
EFFECTIVE DATE OF THIS SUSPENSION.

Original Proceeding – The Florida Bar

John F. Harkness, Jr., Executive Director, The Florida Bar, Tallahassee, Florida,
Adria E. Quintela, Staff Counsel, The Florida Bar, Sunrise, Florida, and Jennifer R.
Falcone, Bar Counsel, The Florida Bar, Miami, Florida,

    for Complainant

J. David Bogenschutz of Bogenschutz, Dutko & Kroll P.A., Fort Lauderdale,
Florida,

    for Respondent